594 So.2d 532 (1992)
Karen HICKS
v.
Terrell HICKS.
No. 91-CA-232.
Court of Appeal of Louisiana, Fifth Circuit.
January 31, 1992.
Cindy M. Harris, Women's Legal Center, New Orleans, for plaintiff-appellant.
Lowe, Stein, Hoffman, Allweiss & Hauver, Robert C. Lowe, Suzette Marie Smith, New Orleans, for defendant-appellee.
Before FINK, J. Pro Tem., and GRISBAUM and WICKER, JJ.
ELORA C. FINK, Judge Pro Tem.
This is an appeal in a child custody dispute, in which the mother of the minor children (two boys, ages 8 and 11 at the time of the hearing) seeks reversal of a judgment that denied her motion for sole custody and designated the mother and the father as joint custodians and "joint domiciliary parents" of the children. The mother asserts that the trial judge erred in refusing to grant sole custody to her, in designating the parties as joint domiciliary parents, and in ordering that the legal residence of the parties' children be in an area accessible to the father. For the reasons assigned, we affirm the judgment.

FACTS
The procedural history of this case is long and complex. The parties have litigated the custody matter vigorously. We shall limit our discussion, as far as possible, *533 to those aspects of the proceedings most pertinent to the issues now before us.
Karen Hicks and Terrell Hicks were married on August 15, 1970. On December 9, 1986 Karen filed a petition for separation from Terrell. In mid-1987, with Terrell's consent, Karen moved with the children to Colorado, where they resided until the summer of 1990.
On February 3, 1988, the parties were divorced and they received joint custody pursuant to a consent judgment, with Karen designated as the residential parent, subject to Terrell's visitation privileges. The consent judgment contained a stipulation that Karen's move to Colorado would not be held against Terrell on any issue concerning the physical possession of the children, in the event he desired the children to return to New Orleans. The parties also stipulated that if they could not agree where the children were to live by May of 1988, the issue would be submitted to the court on motion of Terrell, without need for proof of a change in circumstances. They further stipulated that jurisdiction of custody proceedings would remain in Louisiana. (Judgment on this stipulation was not signed until April 4, 1989.)
In September of 1988, Terrell filed a motion for sole custody; Karen countered with an exception of no cause of action and a motion seeking to change jurisdiction to Colorado, invoking the Uniform Child Custody Jurisdiction Act (LSA-R.S. 13:1700, et seq.). Her motion and exception were denied and the denial upheld by this court.
Terrell's motion for change of custody was tried on May 12, 1989. At that hearing the parties entered into a compromise and stipulation that on June 11, 1990, Karen would return with the children to Orleans Parish, Jefferson Parish or the City of Mandeville (in St. Tammany Parish) for a period of thirty months (i.e., until December 1992). The parties further stipulated that no appeal would be taken from this consent judgment and that jurisdiction of the custody proceeding was to remain in Jefferson Parish exclusively.
Subsequently Karen refused to sign the consent judgment and filed a motion for new trial. Judgment on the stipulation was signed on July 14, 1989. Karen then filed motions for modification of custody, for sole custody, and to restrict, limit and reduce summer visitation, and also filed an appeal from the July 14, 1989 judgment. After the order of appeal was signed she filed another motion for new trial of the May 12, 1989 rule.
On April 11, 1990 this court dismissed the appeal because it not only arose from a consent judgment but also incorporated an agreement by the parties not to appeal. In addition, we ordered the trial court to dismiss the motions for new trial, which were untimely.
Thereafter, Karen sought to stay execution of the July 14, 1990 judgment. This action resulted in issuance of various writ applications and orders, culminating in an order from the Supreme Court to the district court to hear the matter on an emergency basis. The Supreme Court issued the following specific directive to the trial judge:
At the hearing the district court shall rule on relator's motion requesting sole custody based on evidence of facts occurring through the present day; if the district court decides to maintain joint custody, then the court shall first determine whether a custodial parent has ever been designated; based on that determination and applying the appropriate standards, the district court shall then either make an initial designation of the custodial parent or decide whether to keep the previous designation of the custodial parent in effect; and after that determination, the custodial parent shall propose an education plan, and the court shall rule on the proposal and any opposition thereto.
Karen's motions for modification of custody and visitation were tried on August 23, 24, 27, 28 and 29, 1990. The trial judge ruled from the bench on the last day of trial; a written judgment was signed on December 18, 1990. From that judgment Karen now appeals.

ISSUES ON APPEAL
In the judgment the trial court denied Karen's motion for sole custody and, instead, *534 continued joint custody as ordered in the May 12, 1989 judgment. The court made numerous specific modifications to the prior joint custody arrangement, however, among these the following:
(1) The parties were designated "joint domiciliary parents."
(2) They were ordered to share physical custody on the following schedule: Terrell has physical custody of the children from Wednesday after school through the following Saturday at noon; the following week, Terrell has the children from Saturday at noon until Tuesday morning, when he takes them to school. At all other times the children reside with Karen. This results in the children alternating stays of three days with their father and seven days with their mother.
(3) The parties were ordered to agree on a vacation and holiday schedule or submit the matter to the court for resolution.
(4) The court ordered that the children "reside in a vicinity where they can attend a school in the metropolitan area that is accessible daily to Terrell Hicks' residence."
The judgment also included provisions regulating other specific aspects of the joint custody arrangement.
The trial judge's oral reasons for judgment occupy approximately nine pages of the transcript. Excerpts from those reasons are attached hereto. (See Appendix.)
On appeal Karen makes the following contentions:
(1) that the presumption of joint custody was rebutted by the evidence of the parties' inability to communicate or to make joint decisions regarding education, religion, and medical treatment;
(2) that she proved that sole custody is appropriate, considering the factors enumerated in C.C. art. 146;
(3) that she should have been awarded sole custody;
(4) that the joint custody plan fashioned by the trial court was contrary to the best interests of the children;
(5) that the trial court erred in ordering that the children's legal domicile be in an area accessible to their father; and
(6) that the trial court applied an incorrect standard of proof in awarding joint custody.
We address first the issue of the proper standard of proof to be applied in this case.

A. Standard of Proof

Karen asserts that the trial judge applied the wrong standard of proof in determining custody.
The appropriate standard to be applied by the trial court in determining the custody of a child of a dissolved marriage is that of the "best interest of the child." This standard is repeated throughout article 146, and is the sole criterion to be met in making the award.
Turner v. Turner, 455 So.2d 1374, 1378 (La.1984).
In considering the modification of custody granted pursuant to a consent decree rather than by a considered decree, the correct standard to be applied by the trial court is the best interest of the child. Matherne v. Matherne, 562 So.2d 937 (La. App. 5 Cir.1990).
Although the best interest of the child is always the primary consideration, an additional burden is placed on a party seeking to change custody following a considered decree of permanent custody:
When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.
Bergeron v. Bergeron, 492 So.2d 1193, 1200 (La.1986).
Because the proceeding here was to modify a consent custody agreement rather than a considered decree, however, the best interest of the children was the only applicable *535 standard. Thus Karen, as proponent of the change, was not required to prove that joint custody was "so deleterious" to the children as to require its cessation; on the other hand, she cannot take advantage of the longstanding custody arrangement resulting from the consent decree to force Terrell to bear that "heavy burden" of proof.
Similarly, because the prior custody arrangement was by consent, there is no requirement that the moving party show "a change of circumstances that materially affects the child's well-being." See Bergeron v. Bergeron, supra, at 1195.
Thus, Article 146 contemplates that the court shall select from among the litigants' proposed provisional custody plans that provisional plan which most effectively promotes the best interest of the child. This requires the court to compare the advantages and disadvantages of each concrete plan in terms of its effect upon the child's welfare. If the court finds that the evidence preponderates in favor of a particular custody plan as being most effective in promoting the child's best interest the court must adopt that plan, regardless of whether the plan calls for joint or sole custody. The presumption or preference in favor of a joint custody plan only comes into play and requires the court to adopt the joint plan when the evidence is in equipoise, that is when the court is in doubt as to whether the joint plan is superior to a competing non-joint plan in terms of promoting the child's best interest. * * *
Bergeron v. Bergeron, supra, at 1201.
It is clear from the reasons for judgment that the judge intended to apply and considered himself to be applying the best interests standard.
The standard of review in a child custody case is that upon appellate review, the determination of the trial judge is entitled to great weight, and his discretion will not be disturbed on review in the absence of a clear showing of abuse. Bergeron v. Bergeron, supra; Estes v. Estes, 261 La. 20, 258 So.2d 857 (1972). Accordingly, we must review the trial court's ruling from that perspective.

B. Joint Custody/Sole Custody

Karen contends, first, that the trial judge erred in awarding joint custody. She asserts that the testimony presented at trial was sufficient to rebut the presumption of joint custody established by LSA-C.C. art. 146.
LSA-C.C. art. 157 provides that in all cases of separation, divorce, and change of custody after an original award, permanent custody of children shall be granted according to Article 146. Article 146 states that "custody shall be awarded in the following order of preference, according to the best interest of the children." The first listed in the order of preference is "[t]o both parents jointly." LSA-C.C. art. 146(A)(1). Next in order of preference is "[t]o either parent"; however, the burden of proof that joint custody would not be in a child's best interest is upon the parent requesting sole custody. LSA-C.C. art. 146(A)(2).
LSA-C.C. art. 146(C) states, in pertinent part:
C. There shall be a rebuttable presumption that joint custody is in the best interest of a minor child.
* * * * * *
(2) The presumption in favor of joint custody may be rebutted by a showing that it is not in the best interest of the child, after consideration of evidence introduced with respect to all of the following factors:
(a) The love, affection, and other emotional ties existing between the parties involved and the child.
(b) The capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his religion or creed, if any.
(c) The capacity and disposition of the parties involved to provide the child with food, clothing, medical care, and other material needs.
(d) The length of time the child has lived in a stable, satisfactory environment, *536 and the desirability of maintaining continuity.
(e) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(f) The moral fitness of the parties involved.
(g) The mental and physical health of the parties involved.
(h) The home, school, and community record of the child.
(i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(j) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent.
(k) The distance between the respective residences of the parties.
(l) Any other factor considered by the court to be relevant to a particular child custody dispute. * * *
In Turner v. Turner, supra, at 1378-1379 (La.1984), our Supreme Court discussed the joint custody presumption and explained when judges are to employ it and when it must be discarded:
As in any matter in which there is a rebuttable presumption, the burden rests with the party challenging the presumption to convince the fact-finder that his proposed conclusion is more correct than the presumed one. A presumption does not have any probative value, but merely provides the fact-finder with a conclusion in the absence of proof to the contrary. * * * "Presumptions are indulged to supply the place of facts; they are never allowed against ascertained and established facts. When these appear, presumptions disappear." [Citations omitted.]
The article 146 presumption only compels the judge to award joint custody in those cases where other things are equal; or where there is insufficient evidence to rebut the presumption; or whenever neither parent alone would be able to manage a sole custody arrangement, and where it cannot be shown that it would be detrimental to the child to remain in parental custody. Effectively, the presumption only provides the judge with a first choice, which choice must be rejected in the face of evidence which tends to disprove the conclusion. In such a case, it becomes necessary for the other party to reestablish the propriety of the presumption's conclusion.
A presumption in favor of joint custody, as embodied in LSA-C.C. art. 146, may be rebutted upon a proper showing that a different arrangement would be in the child's best interest. Serrate v. Serrate, 472 So.2d 137 (La.App. 5 Cir.1985).
The evidence in this case was compiled over five days of lengthy, exhaustive testimony on all the issues. Both parties were zealously represented by their counsel, to the extent that their vehement advocacy required frequent admonishments from the judge. He nonetheless allowed them wide latitude in questioning the witnesses. In addition, the children were called to testify and the judge conducted their questioning himself, with sensitivity and delicacy.
The testimony establishes that both parties are intelligent, articulate and highly-educated professionals: Terrell is a surgeon and Karen is a teacher (presently unemployed while pursuing an advanced degree in elementary education). Karen is a regular churchgoer of the Presbyterian religion; Terrell's religious views are nonspecific, although he did testify to a belief in God. One of their bones of contention is that the children, when with their mother, attend church services and Sunday School weekly; their father, however, is relaxed on this issue and does not make them attend church on a regular basis. This point was raised by Karen as an example of the more serious type of disagreement between them.
Another issue on which they disagree is the school the children should attend if they are to stay in Louisiana. Terrell enrolled them in a private school in Metairie at which the boys had attended day camp during the three preceding summers. That school has a tightly-structured, traditionally-oriented environment. Karen, on the *537 other hand, enrolled the boys at a private school in St. Tammany Parish, where she wishes to live if she must return to this state. The school she selected has a looser, less traditional structure and innovative teaching methods.
The third major item on which they disagree is medical treatment for the boys, focussing mainly on their dispute as to whether the older child should take Ritalin, a medication prescribed for attention-deficit disorder. Karen took him to a pediatric neurologist in Colorado who prescribed the medication; Karen feels the medicine helps the child behave better and pay more attention in school. Terrell, on the other hand, was incensed that Karen did not consult him, since he is a physician, and he does not want the child to take the medication because of its side-effects. Each party asserts he or she has not been informed by the other of various minor illnesses and injuries the children have suffered while with the other parent.
Finally, Karen charges that Terrell's lifestyle is irregular, unstable and immoral, basing this on the facts that he has a housemate, a male physician who has resided there for several years and whose girlfriend apparently stayed overnight at least once while the boys were there; that Terrell has a girlfriend with whom he admittedly has a sexual relationship, although he testified she does not stay over nor do they have relations when the boys are in the house; and that Terrell had a female medical student from Germany as a houseguest one summer when the boys were with him.
The record demonstrates that both parties are willing and have the capacity to give love and affection to the children of the marriage. Further, both parties place the highest priority on their relationship with the children. The record also establishes, however, that Karen and Terrell Hicks do not communicate effectively with each other or agree on major decisions concerning the children's welfare.
Karen contends these problems effectively obliterate the benefit of joint custody, which is the presumption that it is in the best interest of the child. She asserts the best interest of the children is to be placed in her sole custody because, if a joint custody arrangement were to be upheld, the children would be exposed on a continual basis to their parents' irreconcilable differences and the parents' differing views on education and religion would inevitably expose the children to conflict.
She also argues that joint custody would only work against creating a stable environment for the children because under the trial court's arrangement the children will alternate stays with their parents every three to seven days during the school year. She relies upon the children's three-and-one-half-year residency with her in Colorado as evidence that they should be in her sole custody and asserts that the change in their living arrangements made by the judgment on appeal disrupts the stability of their former way of life. She desires to continue living with the children in Colorado.
In making this argument, however, Karen ignores the fact that she was bound, under the 1989 consent judgment, to return with the children to the New Orleans area no later than June 11, 1990, and to remain for 30 months thereafter. That judgment is final and is the law of the case. Thus, the children's Colorado lifestyle and living arrangements had to be interrupted and a new lifestyle had to be made in Louisiana.
Terrell, in turn, does not assert that the children's living with their mother was deleterious; he willingly admits she is a good parent. He points out, however, that from the first Karen was permitted to leave Louisiana with the boys on the condition that she would return with them after completing her education. (She has pursued advanced degrees in education at a Colorado university while receiving rehabilitative alimony from Terrell.) The Colorado living arrangement was never intended to be permanent; that was the reason for the consent decrees' reiteration of the stipulations that the move to Colorado would not be held against Terrell and that Karen would return to the New Orleans area in June 1990 (the date by which she was to have *538 completed her course work for her doctorate of philosophy).
Despite Karen's attempts to portray Terrell's lifestyle is irregular, unstable and/or immoral, we are unable to find that the trial judge was clearly wrong in his factual findings regarding the parties or that he abused his discretion in denying the motion for sole custody. We have reviewed the evidence carefully and have examined the testimony painstakingly; our assessment of the case, like the trial judge's, is that it would be in the best interest of these children to have frequent and regular contact with both parents.
Karen's strongest argument is the apparent inability of the parties to agree on major issues such as education, religious training, and medical treatment. She cites the principle that "[j]oint custody can only be in a minor's best interest where there is an ability of the parents to communicate and share the responsibility of raising the child." Watermeier v. Watermeier, 504 So.2d 856 (La.1987).
Our interpretation of the evidence, like the trial judge's, is that Terrell has shown more cooperation with Karen than she has shown with him. The judge said if he had were to base his decision solely on that, he would name the father as domiciliary parent. However, as did the trial judge, we conclude that Karen and Terrell are capable of reaching agreement on these issues through compromise, if circumstances so require.
Accordingly, we find that the appellant has failed to rebut the presumption that joint custody would be in the best interest of the children; therefore, the trial judge did not abuse his discretion in denying Karen's motion for sole custody.

C. Legal Residence

The next issue is whether the trial judge erred in ordering that the legal residence of the children be in an area "accessible" to Terrell.
In fact, the judgment does not order that the children reside in an area that is accessible to Terrell's residence, but that they attend school in an area accessible from Terrell's residence. In effect this requires that the children attend school in the metropolitan New Orleans area.
The judge stated he ordered that arrangement because he specifically found that Terrell's home was the "overriding" stabilizing influence in the case. We cannot fault that finding, because the children obviously are more familiar with their father's home and neighborhood in Metairie, where they formerly lived and where they have visited for years, than with the mother's new living arrangements in Mandeville following her move from Colorado.

D. Modification of Prior Custody Arrangment

Finally, the appellant asserts that the trial judge erred in modifying a custody arrangement that was in effect for over three years.
In awarding or modifying a custody arrangement, the best interest of the child is not only the paramount consideration but is, in effect, the sole criterion. Favaloro v. Cooper, 562 So.2d 943 (La. App. 5 Cir.1990). Stability of environment, while not the only consideration in a custody case, is a major factor. Id. at 946.
"In some instances the benefits to the child from a modification of custody may be so great that they clearly and substantially outweigh any harm that will be likely to result from the change even though the present custody is not deleterious to the child." Bergeron v. Bergeron, supra, at 1200.
As stated above, the prior arrangement, in which the boys lived with their mother in Colorado, was required to be interrupted in any event by their mandated return to live in Louisiana in June 1990. Further, there was no showing that joint custody would not be in their best interest. Accordingly, there is no merit to Karen's argument concerning modification of the prior arrangement.

DECREE
For the foregoing reasons, the judgment of the district court is affirmed. Each party is to pay his or her own costs.
AFFIRMED.

*539 APPENDIX
(Excerpts from Oral Reasons for Judgment Rendered by Hon. Charles V. Cusimano II on August 29, 1990)
My decision is not based on any one particular incident or one particular criteria that you look at under 146. It's based on an accumulation of testimony. It's also based on judgment of characters, assessment of personalities involvedtheir ability to deal with each other. Assessment of the children, their needs, both physical and emotional. So it's an accumulation of many things that I thought about in rendering this decision. And it isn't an easy decision. It's a very difficult decision and it's one that makes me all the more sure I don't want to sit as a domestic judge all the time.
First we need a little review. There's been a great deal of testimony regarding the course of action chosen by Mrs. Hicks in the past year since the consent judgment, possibly even dating back to the previous consent judgment. This court in rendering its decision does not take into consideration any legal action taken by Mrs. Hicks. It considers that within her right as a citizen, her right as a person. Nothing was done illegal, everything was done within the legal system and she pursued what she saw thought were her rights. So this judgment in no way reflects any action she may have taken.
The court does, however, go back and review the judgments and the history of this case and it looks at the decisions made between the parties dating back to the judgment signed, I believe, May [April] 4th, 1989, when Mrs. Hicks was first allowed to leave ... this community. And the consent judgment was entered into regarding the alimony pendente lite. There was a great deal stated in the judgment dealing with the parameters in which Mrs. Hicks was to leave the jurisdiction of this court. It shows that both parties were concerned with not only the custody of the children but also the physical location of the children. I believe, quoting the judgment, ... it is unnecessary for Dr. Hicks to show any change in circumstances ... concerning that rulingtheir physical location shall be decided de novo. This was the judgment decided and agreed to by the parties.
Looking further, there is a consent judgment fashioned in May of '89 that has been spoken [of] ... both favorably and ... with a great deal of contumacious disregard. Again, in that judgment there is a great deal of reflection and a great deal of concern on who is going to be the custodial parent and who is also going to be the domiciliary parent, stemming back from the '87 judgment. It was always considered that Mrs. Hicks needed an opportunity to clear her head for whatever reasons and whatever terrible things may have happened during the marriage and immediately preceding and following the divorce. And I believe, in that spirit, Dr. Hicks had entered into agreements allowing Mrs. Hicks to leave the jurisdiction.
I've listened to the testimony of the parties and I've got to tell you I have a great deal of concern yet regarding their ability to deal with each other. This is an important point because, in many instances because of their inability to deal with each other, joint custody may not even be in the best interest of the children. However, we heard a case yesterdayI denied the motion or the rule to change custody because, overriding their inability to get along, I found that it was in the best interest of the children to keep joint custody.... [W]e have a judgment of May of 1989, signed in June or July of '89, stating there is joint custody. That is the judgment we are operating under todaywe're deciding only domiciliary arrangements.
A great deal of testimony has been given as to stability of Dr. Hicks' home. The children have been going there for three-and-a-half years, they have grown up ... since 1980 or '81 in the Metairie area. This cannot be discounted by the court. I think it is important. The court has also considered the fact that it feels it is in the best interest of the boys to be *540 in this metropolitan area. It's in the best interest of the boys regarding their father and probably for a more stable relationship with their mother. Because they will be able to deal with both parents. I think that, because of the inability of the parents to deal with each other, it's even more important for them to be in the vicinity of each other. And attempt to maintain a joint custody arrangement.
If I was to ... base my decision solely [on] which parent has been more cooperative with the other, I can make a call right now that Dr. Hicks has shown an ability to be more cooperative with Mrs. Hicks than she is with him. And this ... causes me a great deal of concern. I think that, as parents, a hatchet has to be buried between the two in dealing with the children. I believe counsel for Dr. Hicks quoted 146(A)(2), that was something I've looked at from the second day of this trial, and the ability of the parents to communicate. I have counseled both parties that I think that that is extremely important. And if I was to make a decision based solely on the long-term best interest of these boys, they would be stayingthe domiciliary parent would be the father right now.
Now, everybody says whenever there's an "if", what good is that? But I've got some other problems. I got problems in the stability need for the children. I heard the mother's testimony about ... what she can provide in St. Tammany, what she can provide in Greely, Colorado. I don't completely buy that as a good stability factor for the kids, because they are going to constantly need to come see their father. The older they get, the more their need. If I was a person that believed in splitting the children, it would be very easy ... right now for me to decide to let ... the older son live with the father. I could do that and go to sleep. But I'm worried about other problems that may present: competition between the parents with the two children: one "have" and "have not". I can't live with myself for the thought of, six years from now, what situation that may cause between the boys, not between the parents. And because of that I have disregarded the possibility, at this time, of splitting the children up, unless it further deteriorates.
I also do not want to further divorce these parents in the eyes of their children. The children know that there is a legal divorce between the parents, but there is no need ... for both children's sake, that they have to be divorced in every activity, including the ability to parent these children. It's got to be mutual.
On the record and for the purposes of review, I'm dealing with two intelligent parents, two people capable of adjusting their lives for the benefit of these children. And, because they are capable and they ... both have the ability to do so, I'm holding them to that burden.
* * * * * *
Now, to clarify for the record one point, the reasons I say [the children's school must be] accessible to the father [is] because the stabilizing influence, overriding in this case, has been the father's home. I feel it's ... there, his profession is here and, for the kids' sake and the best interest of the children, they need some stability, as said by both sides, that's the stabilizing factornot Covington, not Greely, Colorado. So I want access so that the father's home presently will be the center of that school. The mother can locate where she doesn't have to live in the same neighborhood, she doesn't have to live in the same specific area, but she's going to have to live in an area that will access the boys to a school that can easily be served by the father. Now, if that's confusing and later on it needs to be give greater explanation,... I'm prepared to do so. * * *